# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

ERIK MARTIN,
    *Plaintiff*,

v.

RYOBI TECHNOLOGIES, INC., *et al.*,
    *Defendants*.

No. 3:15-cv-00973 (JAM)

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Plaintiff severely injured his hand on the blade of an electric table saw that he was using to cut pieces of wood. Plaintiff now seeks recovery from defendants, alleging that the design of the saw made it unreasonably dangerous. Defendants have moved for summary judgment. I will grant in part and deny in part their motion.

### BACKGROUND

The following undisputed facts are set forth in the light most favorable to plaintiff as the non-moving party. On August 1, 2014, plaintiff Erik Martin was cutting pieces of wood with a Ryobi BTS21 table saw at a job site in Glastonbury, Connecticut. He was using the saw to cut pieces of cedar wood down to one-inch shims. The saw was designed, manufactured, and distributed by defendant One World Technologies, Inc. (One World).[1]

As plaintiff was pushing one of the wood pieces toward the blade, the wood caught an edge, and the blade began to slow down. Then the blade suddenly sucked the piece of wood

---

[1] Plaintiff filed this lawsuit against One World as well as against Ryobi Technologies, Inc. (Ryobi) and Techtronic Industries North America, Inc. (Techtronic). As clarified at oral argument, plaintiff does not dispute that Ryobi and Techtronic had nothing to do with the design, manufacture, or distribution of the saw that injured him. In addition, plaintiff has abandoned his failure-to-warn claim. Accordingly, plaintiff's claim at this time proceeds solely on a products liability claim of design defect against One World.

quickly towards it—plaintiff's left hand was drawn as well into the blade, resulting in a severe injury.

The saw that injured plaintiff was manufactured by One World in 2007. It is in the class of saws referred to as a bench top or table saw. It weighs 61.5 pounds without the stand and has a retail price of $249. It came equipped with a 3-in-1 blade guard assembly. The assembly included (1) a plastic basket that provides a physical barrier between the blade and the operator; (2) a splitter-spreader; and (3) anti-kickback pawls. The latter two elements reduce the likelihood of a "kickback" that could cause injury.

When plaintiff was using the saw, the 3-in-1 blade guard that was supplied by One World to go with the saw was not attached. Someone else had removed it. As far as plaintiff knew, no blade guard was available for use on the saw.

Plaintiff's evidence includes the expert testimony and report of Darry Robert Holt, a mechanical engineer with more than 40 years of experience evaluating the safety design of hundreds of machines and products of all types, including table saws. Plaintiff's expert opines that the saw was defective in design because it should have contained at least two superior safeguards to prevent the kind of injury that plaintiff suffered: something called "flesh detection technology" as well as a "modular" blade guard.

Flesh detection technology first became available in 1999. With this technology, a blade is able to detect when it comes in contact with flesh. Upon sensing the flesh, the blade stops within a few milliseconds and drops below the table surface. The system reduces the severity of a blade contact injury from catastrophic to minimal. Currently, only one manufacturer—SawStop, LLC—makes saws with flesh detection technology. SawStop initially used this technology only for heavy duty "cabinet" saws that weigh hundreds of pounds and cost between

$2,000 and $3,000. In 2014 it began to manufacture transportable table saws with flesh detection technology at a retail price of $1,600.

A modular blade guard provides more frontal protection from the blade when the hand approaches the blade from a fore/aft vector. In addition, the component parts of the blade guard can be individually removed by the user, and the guard includes a splitter that can be adjusted to minimize kickback occurrences even when other safeguard components are missing. The modular blade guard is more "user friendly" because it offers better visibility than the 3-in-1 blade guard.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

The Connecticut Products Liability Act provides a common cause of action for claims alleging personal injury and certain other harms from the use of a commercial product. *See* Conn. Gen. Stat. § 52-572m; *Moss v. Wyeth Inc.,* 872 F. Supp. 2d 162, 165 (D. Conn. 2012). Among the various types of products liability claims that a plaintiff may pursue is a claim for

3

design defect: a claim that a product by its very design is unreasonably dangerous to a user or consumer. *See Bifolck v. Philip Morris, Inc.*, 324 Conn. 402, 434 (2016). All such claims for a design defect require a plaintiff to prove five basic elements: (1) that the defendant designed the product at issue; (2) that the product as designed was defective (*i.e.*, that it was unreasonably dangerous to the consumer or user); (3) that the defect caused plaintiff's injury; (4) that the defect existed at the time of design; and (5) that the product was expected to and did reach the consumer or user without substantial change in condition from the manner in which it was designed. *See ibid.*

How does a court decide if a product is "unreasonably dangerous" in its design? Connecticut courts ordinarily apply a "risk-utility" test. *Ibid*. The risk-utility test focuses on whether a reasonable alternative design was feasible and available that would have avoided or reduced the risk of harm, such that the designer's failure to use that alternative design rendered the product unreasonably dangerous. *Id.* at 434-35. Among the factors to consider when deciding if an alternative design was feasible include: (1) the degree to which the alternative design could have reduced the product's danger without unreasonably increasing its costs; (2) the degree to which the alternative design could have been deployed without unreasonably impairing the product's usefulness, longevity, maintenance, and esthetics; and (3) the degree to which the use of the alternative design would in turn have entailed risks of equal or greater danger than the product as originally designed. *Id.* at 435.

In light of this framework, I now turn to whether there are genuine issues of fact as to plaintiff's claim that the saw was defective for failure to use flesh detection technology and for failure to use a modular blade guard. Then I will turn to whether there is a genuine issue of fact

as to One World's affirmative defenses that claim product misuse and material alteration of the product as designed.

### *Flesh detection technology*

As to plaintiff's claim that the saw should have included flesh detection technology, One World argues that this technology was not commercially available in saws of similar price and size at the time the saw was manufactured in 2007. At that time, the only commercially available table saw on the market that incorporated flesh detection technology was a very large "cabinet" saw that weighed several hundred pounds and cost between $2,000 to $3,000.

Plaintiff concedes all this but maintains that the question is one of *feasibility* not *availability*. Of course, commercial availability would be very strong evidence of feasibility, but it is entirely possible for a feasible product to remain commercially *un*available for any number of reasons.[2] According to plaintiff's expert report, it would have been feasible to incorporate flesh detection technology into a table top saw as early as 2002.

To be sure, there is no dispute that incorporating flesh detection technology into the saw at issue in this case would have increased its weight and cost. Plaintiff's expert opines that the technology "can be expected to add, at most, 10 lbs. to the weight of the saw." Doc. #48-9 at 43. And plaintiff's expert concedes that such a weight increase would hinder the transportability of the saw. But whether this added weight and diminution in portability is offset by the reduction in risk of physical harm that inheres in flesh detection technology is a factual question best resolved by a jury.

---

[2] One reason might be a company's decision that incorporating a safer design would not be profitable. The parent company of SawStop, SD3, LLC, has alleged that saw manufacturers colluded to boycott licensing flesh detection technology from SD3 because in part of a concern that if some manufacturers adopted the technology while others did not, "then an issue could arise as to whether the non-adopters might be sued for producing an inherently unsafe product." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 419 (4th Cir. 2015).

As to cost, plaintiff's expert estimates that flesh detection technology "would add approximately $100 to the cost of the saw." Doc. #48-9 at 44. It is true that plaintiff has not adduced evidence of precisely how much flesh detection technology would have cost to incorporate into the saw when it was manufactured and sold. But, "as to economic feasibility, the plaintiff need not prove the precise cost of the alternative design." *Bifolck*, 324 Conn. at 433. In view of plaintiff's expert's report, a reasonable jury could "conclude that any increase in cost would not materially affect the desirability of the product in light of the benefit derived." *Ibid.*

I am not persuaded by One World's emphasis on the fact that plaintiff was a sophisticated user of table saws with years of experience. It does not cite any authority for the proposition that companies may skimp on safety if their consumers or users have the benefit of prior experience using similar products.

It is true that the saw was in full conformity with all applicable safety standards. Yet conformity with relevant safety standards is not dispositive of whether a product is defective; it is merely some evidence for the finder of fact to consider in determining whether the product is defective. *See, e.g.*, *Wagner v. Clark Equip. Co.*, 243 Conn. 168, 190 (1997).

Numerous other courts have ruled for plaintiffs in cases involving the same or similar saw at issue in this case. *See, e.g.*, *Osorio v. One World Techs. Inc.*, 659 F.3d 81, 85-86 (1st Cir. 2011) (evidence sufficient to permit jury to conclude that table saw without flesh detection technology was defectively designed); *Nathan v. Techtronic Indus. N. Am., Inc.*, 92 F. Supp. 3d 264, 273 (M.D. Pa. 2015) (fact issue whether omission of flesh detection technology constituted a design defect); *Anderson v. Techtronic Indus. N. Am., Inc.*, 2015 WL 12843836, at *7 (M.D. Fla. 2015) (fact issue regarding feasibility of incorporating flesh detection technology under the risk-utility test); *Wood v. Robert Bosch Tool Corp.*, 2015 WL 5638050, at *5 (E.D. Mo. 2015).

6

*But see Fortune v. Techtronic Indus. N. Am.*, 107 F. Supp. 3d 1199, 1203-04 (D. Utah 2015) (concluding as a matter of law that saw without flesh detection was not defectively designed but applying the consumer expectation test rather than the risk-utility test). Accordingly, I conclude that a genuine issue of fact remains for trial about whether the saw was defective in its design for failure to have incorporated flesh detection technology.

### *Modular blade guard*

One World next argues that plaintiff's claim as to the lack of a modular blade guard cannot prevail because when plaintiff used the saw there was no guard at all, such that there can be no causal link between One World's design of a 3-in-1 guard and plaintiff's later injury. I do not agree.

To begin with, there is at least a genuine fact issue whether the 3-in-1 guard was removed because it was unwieldy and "unfriendly" in the sense of making it more difficult to use the saw. Plaintiff's expert's report notes that the modular guard "is widely believed to be more user friendly and to provide much more visibility of the cutting operation than the old [3-in-1] guard." Doc. #48-9 at 14. Indeed, plaintiff's employer stated that he removed the blade guard from the saw because of lack of visibility. *See* Doc. #48-12 at 12. In addition, there is a genuine issue of fact whether a modular blade guard would have prevented or at least mitigated plaintiff's injury in a way that the 3-in-1 guard would not. Doc. #48-9 at 5, 10; Doc. #48-11 at 45-46. All in all, a genuine fact issue remains as to whether the 3-in-1 guard was defective in design in light of the alternative use of a modular blade guard and whether this defect caused plaintiff's injury.

*Product misuse*

One World further argues that it is entitled to summary judgment on its defense of product misuse, because plaintiff used the saw only after the 3-in-1 blade guard had been removed. I do not agree.

A plaintiff's unforeseeable misuse of a product is a valid defense to a product's liability claim. *See Elliot v. Sears, Roebuck & Co.*, 229 Conn. 500, 507-08 (1994). Still, in light of Connecticut's comparative fault statute, a plaintiff's unforeseen misuse does not completely bar the plaintiff from recovery unless the plaintiff's unforeseen misuse was the sole proximate cause of injury. *Id.* at 515-16.

A material fact issue remains whether plaintiff's non-use of the 3-in-1 guard caused the injury, and there is *no* evidence in the record that non-use of the 3-in-1 guard was the sole cause. According to plaintiff's expert, the 3-in-1 guard would not have altogether prevented plaintiff's injury in this case, although it may have mitigated the injury to some degree. *See* Doc. #48-9 at 5; Doc. #48-11 at 41-42, 47.

Moreover, a genuine fact issue remains whether plaintiff's misuse of the blade guard was foreseeable. Plaintiff's expert report notes "that the guard assembly was long known by Ryobi to be unwieldy or unfriendly to users and typically removed and not used." Doc. #48-9 at 5. This fact was well known throughout the entire industry. *Id.* at 9-11, 13-14; Doc. #48-11 at 25-26. Additionally, in 2007, the UL987 standards were changed to require a modular guard assembly rather than the 3-in-1 guard assembly that was supplied with the saw because it was understood that such a change would reduce the likelihood of removal and non-use of a blade guard. Doc. #48-9 at 14; *see also Stollings v. Ryobi Techs., Inc.*, 2011 WL 211008, at *3-4 (N.D. Ill. 2011)

(fact question whether non-use of blade guard was foreseeable in view of plaintiff's evidence that the industry and manufacturer were aware that large percentage of users removed the guard).

*Material alteration*

One World next argues that it is entitled to summary judgment on the basis of its defense that its product was materially altered from its design. I do not agree.

Connecticut law provides that a product seller shall not be liable for harm from its product if the product was altered or modified by a third party, unless—among other reasons—the alteration or modification "was the result of conduct that reasonably should have been anticipated by the product seller." Conn. Gen. Stat. § 52-572p(a). For the same reasons I have discussed above with respect to product misuse, a genuine fact issue remains whether the alteration that occurred here—the removal of the 3-in-1 guard—should have been anticipated by One World.

## CONCLUSION

Defendants' motion for summary judgment is (Doc. #48) is GRANTED in part and DENIED in part. The motion is GRANTED in whole as to Count One (Ryobi Technologies, Inc.) and as to Count Three (Techtronic Industries North America, Inc.). The motion is GRANTED in part as to Count Two (One World Technologies, Inc.) insofar as it is based on a failure-to-warn claim. The motion for summary judgment is otherwise DENIED as to Count Two insofar as it is based on a design defect products liability claim.

It is so ordered.

Dated at New Haven this 22d day of March 2018.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge